Good morning. It pleases the court, Richard Cornell, appearing for the appellant, Darin French, and in the ten minutes, I want to focus on the sufficiency of the evidence. I'm familiar now with United States v. Neville's, which was handed down by this court and bank after the great brief. If I had known Neville's was there when I wrote the great brief, I wouldn't have made my Wiseman and Bautista-Vila type argument. I don't think, frankly, it was necessary. I think it was gravy. So I am not going to argue the reasonable hypothesis standard. I'm not going to argue the evidence in support of innocence. I'm going to stick to what I think is the model, followed certainly by the Fourth Circuit in the Evan Smith case that we did cite in the great brief, and Juan H. v. Allen case out of this court, amongst many others, on sufficiency of the evidence, which is, number one, what are the inferences that the government wishes to draw? Two, are they supported by the evidence? Three, do they logically support the issues at bar, which in this case are guilty participation by my client in the fraudulent scheme, guilty intent at the time of the scheme, and guilty knowledge. Mr. Cornell, with due respect, there are a number of arguments that you've made in this case that carry something, I suppose. But sufficiency of the evidence? I mean, this case, all the government has to do is to show that any rational trier of fact would have found it the way the government wanted. I mean, this case is just absolutely loaded. The guy sets up a bank account with his wife. The money goes in there. They're the only ones that draw. He tells them that Vicki, Jeff, and Juan did it. It's a small company, and yet he can't remember their last names. I mean, if he says that a sheriff, Chad Flakey, had been hired or basically selected to investigate, I mean, the thing is just riddled with nonsense. How can you state without a big smile on your face that no rational juror could have found that there was enough evidence to convict this man? Because seriously, that's what I'm trying to do. I know. Because seriously, this is the type of case where when it's presented, what we have is a company insider typically. We don't have that. It's a case where if we don't have a company insider, we have a forensic accountant to look at the company's records and explain what they mean. We don't have that either. Who's Chad Flakey? Chad Flakey is apparently the name of a deputy sheriff per Mr. Muscat that my client said worked for the Plumas County Sheriff's Office. How come they have no record of such a guy? There is no record of such a guy. Well, that's not a good fact for you. No, it's a false exculpatory statement is what it is. How about Vicki, Jeff, and Juan? Those are people who work for the company. He doesn't know the last name. How many people worked for this company at the highest level? At the highest level in this company, it wasn't in existence real long. For a real long period of time, there were about a half a dozen. Okay, so there were six people. He named three, and he doesn't know their last names? That was the case. Doesn't that meet the standard easily, even if that were the only standard, the only set of facts that a juror could have found that he was properly convicted? Well, again, would you believe that story if you were on the jury council? That he had people working for him and that on the spot he couldn't remember the last names? It would give me a pause for concern, certainly. Isn't that all that we need here? Pause for concern? Well, the one juror could have believed that this was the situation, that the government had met its burden. If I were on the jury, I would want some evidence that connects up participation in the fraudulent scheme at the time. I would want more than this. Let's take the bank account. Okay. You've got hundreds of thousands of dollars being deposited into an account. It was opened by your client and his wife, and he were the only people who had access to that account. He drew checks on it. Isn't that evidence of participation in the scheme? I would submit to you that what it shows is... It was Lanky, but it was not Chad. Right. What I would submit to you is that it shows that he knew who the company's creditors were. He knew who needed to get paid. He knew, I would say, he knew that money was coming in from Maytag. I can't deny that. By the way, money from good claims was coming in from Maytag. Is there evidence of that? Yeah. Yeah. The trial prosecutor kept arguing this is a classic fraudulent scheme because there are good claims with the bad claims. There was $500-and-some-odd-thousand overall from Maytag, of which Maytag said $353,000 came from fraudulent claims. So I submit to you that what you really have to have is an insider explaining that this was a scheme that he set up, that he knew of, that he participated in. The argument is, well, he benefited from it because he got paid. Sure. It was a for-profit company. The service techs who apparently did the work that they didn't make claims for the work they didn't do also got paid. The insider who submitted the invoices also got paid. What does that prove? He got paid. Was he paid an exorbitant amount? There I think we would need a forensic accountant. What do we mean by exorbitant? Exorbitant relative to what? Relative to the company's prior history? Relative to companies like this, competitors? We don't have any of that evidence. All we know is people got paid. Otherwise, the trial prosecutor argued that Mr. French was an authorized Maytag repairman. He was not. He owned the company. He was not an authorized Maytag repairman. But the trial prosecutor argued as an authorized repairman, he had access to repair manuals and guides. Well, wasn't there an expert or a witness from Maytag who testified, a guy named Tyson? Yes. Well, Tyson said, I mean, he testified, apparently the jury believed it, that there were $350,000-some-odd in fraudulent claims. Correct. Isn't that some evidence that they could hang their hat on? There's no question that the government proved a fraudulent scheme. I'm not here to argue that. The question is, what did my client do in connection with that scheme? Did he participate in it? Did he do what he did with guilty intent, guilty knowledge? How would the manuals and guides inform one to create a fraudulent scheme? There was no evidence of that. The trial prosecutor argued that my client was given the identity from which he could make or input the claim. Well, technically, that's not true. But I would concede that in a small company like this, he would have had access to that. But would he have had sole access to that? In that sense, the cases I cited in the blue brief, the Webb and the Treguzi cases, I think are instructive. In a case like this, I submit that's what it comes down to. There has to be proof. If we're going purely circumstantial, as we are here, there has to be proof that he has sole access. Absent that, we need a company insider. We don't have the ---- Well, that's what he has with the bank account, isn't it? Pardon me? Isn't that what he has with the bank account? He and his wife are the only people who had access to the bank account. And that's where all of the money went. Right. Although you understand there were also debit cards out to the servicemen. Well, let's say the debit cards were used. Who used the debit card? Servicemen. Okay. So they did the ---- So does that mean that that explains why the money went in there and how they took out money? Clearly your client took out money, drew checks on it, right? That's correct. He was paid an income. Isn't that enough? What if ---- I'm going to get into the Neville argument. I won't make that. Again, I would submit there has to be some evidence of more. I mean, of course it's a for-profit company, but is it an exorbitant amount? Is there something about the amount that he pulled out that would suggest fraudulent intent? You're arguing that it's a question. How can you be a little bit pregnant? I mean, either he got money or he didn't get money. Right. The record shows that he did. Certainly. Isn't that enough? I don't think it is. Otherwise, every owner of every company where this happens would be guilty, or every owner of every for-profit company where this happens would be guilty. Well, if you had allegations of a fraudulent scheme and you could show that the owner of the company did what your client is accused of doing here and was shown to have done so by circumstantial evidence, you may very well be right. Some would argue that there are such things going on in larger companies, but that's not before us. I'm just bothered by the fact that the proof of this is just to put in the records and to say to the jury, follow the money. I mean, this wasn't Watergate. What does that mean? We have to have somebody actually following the money for the jury. How can a jury be expected to make anything out of that? Our bottom line here is that what the government proved was a fraudulent scheme. I see you're out of time. Boy, that went fast. Okay, thank you. Thank you. Good morning. Good morning. May it please the Court, Elizabeth Olsen from the Reno U.S. Attorney's Office on behalf of the United States. Could you speak up just a smidgen? Oh, thank you. That happened in the other room, too. As the Court recognizes, the sufficiency of the evidence is the most deferential standard of review. The defendant acknowledges lots of evidence that there was a scheme, as opposed in regard to the defendant's participation in that scheme, evidence that he directed the money from that scheme to be deposited into a bank account that he controlled and then he spent the money. The checks, we actually, the jury had a box of all the canceled checks from this account during that time frame, and Mr. French, you know, he was the signer of 97, 98 percent of all the checks. What does that show, then? What? What does that show other than he signed the checks? Well, that he controlled the money. I mean, he spent the money from that account, the $350,000. How did he know it was for fraudulent claims? What proves that he knew what the underlying money aspect? In other words, counsel's argument is, yes, there's plenty of evidence of a fraudulent scheme. His argument is nexus to Mr. French as being part of it, that he was personally aware. So what did the jury have to say? He had to be personally aware. I think that that goes, first of all, that this was a tenfold increase in the amount of claims from when he took over the company. The number of claims to Maytag went up tenfold, and they got, you know, hundreds of thousands of dollars more than the predecessor company had gotten. And then you go into, you know, when Maytag sent their security guy to confront him about it and find out what happened, you know, what's happening with these hundreds of thousands of dollars of false claims. He says, oh, yeah, I think, you know, I was thinking that Jeff had something to do with that, so I fired him. And Detective Chad Flakey is investigating. And, I mean, these things are just, you know, pulling out of thin air. Oh, and then he says, I have to go now, but I'll meet you for lunch, and then doesn't show up for lunch. I mean, you know, you put that kind of evasion and those kind of implausible, easily disprovable claims against this tremendous amount of money that's going into a bank account that the defendant is controlling and spending. The defendant made a claim in their opening brief about the loss calculation, and they have this idea that it has to be just what the money that Mr. French personally profited, you know, in checks to himself, that that's the only thing that he could be charged with, and then that he can actually only be charged with half of that because he's married. But I think that, you know, what we say in response is the fact that a defendant uses the proceeds from a fraudulent scheme to shore up a failing business as opposed to buying a boat. I mean, that doesn't you're not excused from the consequences of the money that you take in fraud when you are using that money to, you know, to prop up a failing business, which apparently a lot of the money went back into the business or, you know, to pay the employees. But that doesn't excuse the fraud. I think that those were the only issues that he raised on his argument. If you have questions. I think the one thing I'd want to say is there were allegations of prosecutorial misconduct in the opening brief, and I just think it's important to know that or to remember that prosecutorial misconduct is a very serious accusation, and there are times when it's warranted. There are times when it's even, you know, arguably the evidence in the case would warrant an accusation. These accusations of prosecutorial misconduct I just find to be patently baseless. You know, the idea that by presenting evidence of the authorized service area, that it was prosecutorial misconduct for us to introduce the contract that shows the geographical area that Lake Tahoe Appliance was authorized to serve, because somehow that was presenting an inference that every claim outside of that area would be a fraudulent claim. In fact, we didn't argue that. We argued that, you know, good frauds, you put some good claims, some bad claims, you know, you wrap them up together, and that's how you get away with it. If we agreed with the government about the sufficiency of the evidence, do we even need to get into the timeliness of the motion for reconsideration, the motion for new trial? No, no. And I think that Judge Sandoval made a very perceptive decision on that, which is to say that that motion, the one that was filed three months later, it was titled a motion for reconsideration, but it wasn't a motion for reconsideration. It wasn't asking, you know, a motion for reconsideration is saying, you know, Judge, when you made this decision, you forgot about this piece of evidence or you didn't read this case or something like that. This was an entirely new, this was a motion for a new trial based on the defense case that we would have put on if we had decided to put on the defense case. Does Ibar create a problem in terms of the breakdown of subcategories in that situation, or is this just all unnecessary? I think it's all just unnecessary. I mean, I think it, you know, he, the initial motion for a new trial was based on insufficient evidence. Right. Okay. The Court denied that. If this Court finds that the evidence was sufficient, there was no reason for the judge to have reconsidered that initial order. The second motion. Basically, those motions would be moot from your perspective. Essentially, yeah, essentially. Under the district court, though, said to deny the new trial motion, constrain it as a disguised new trial motion. He said that it would be defective because it violated the 7-day rule because it really wasn't newly discovered evidence. Yes. Okay. So then the alternative ground was that if it's a motion for reconsideration, it has to be filed within the time available for appeal under 4B. And that runs from the date the order sought to be reconsidered has entered and had expired. Now, that's a little confusing because sometimes those orders are not immediately appealable. So what's your understanding of the timing? Nevada doesn't have a local rule, does it? No, I don't believe so. And I actually, I'm relying on the other piece of that. I think that this, that an order for reconsideration of a motion for a new trial, I mean, I think the denial of a motion for a new trial I don't think is appealable until after sentencing. I mean, I'm not sure that that's a final order until after sentencing. So I don't know that that 10 days actually started to run and expired. But the other piece of it is, I mean, so as a motion for reconsideration, I don't think that that 10-day appeal time had actually run. I think the judge, the district court, might have been incorrect about that. But he was absolutely correct that what this really was is a motion for a new trial based on evidence that was not newly discovered. And so it's, I think it's 14 days now instead of 17. So it's about three months later. Okay. Okay. If you don't have any other questions, thank you so much. No, you used up your time. It will give you a minute if you can keep it to a minute if you want to. I don't think so. Thank you very much. Thank you, sir. Ms. Olson, thank you. The case is disargued as submitted.
judges: Silverman, Fisher, Smith M.